Please the court. Ed Scheidemann for Appellant, Prime Healthcare Services. Only I will be arguing today. Okay. Per the court's directive, I will reserve five minutes for rebuttal. There are a number of issues on appeal today, and I think it probably makes sense I'll start with the Rule 41B issue and then, after that, move right into the meat of it, which is the conspiracy allegations. We say that the court below erred in applying the Rule 41B sanction because Rule 41B, by its plain language, covers situations where there is a failure to comply with the court order or where there is a failure to prosecute. We think by the clear language of the court's order that there is no failure to comply. Specifically, the court's order said, if Prime Healthcare wishes, it may file its amended complaint. Failure to do so may result in dismissal. You put a lot of mays in there where I don't think there was. Well, it did say wishes. It said it shall file. If it wishes. If it wishes, it shall file. I didn't mean to, but the operative thing is if Prime wishes, it shall file. It's by a certain date where the case may be dismissed. And then didn't the court then say if it doesn't within 30 days, it may be dismissed? How or may? Exactly. Well, it will be dismissed. Okay, but that's a little shot over the bow in terms of a warning. Well, it may or may not be. I think the operative thing is that the plain language of the order says if they wish, and that is not mandatory language. You have plenty of orders that when you have an amended complaint, they say you shall file by this particular deadline. In this case, it said it wished. You're saying that, if I understand it, that there's nothing there to indicate that the dismissal with prejudice is going to be a Rule 41 type of dismissal. It could just be, okay, you've decided to stand on your complaint, so I adhere to my decision that you haven't stated a cause of action, and you're dismissed with prejudice. And then you take it straight up on appeal on the merits. You don't have to reach the Rule 41 factors, yes? I think that's exactly how the plain language of the order appeared. I think wishes is an added. That distinguishes this from the other cases below. It clearly is an option. It's not mandatory language. So we don't think that there could be a failure to comply. You waited two months, and then you waited, I guess, and then part of it was, I guess it would be safe to say, I'll say it, and the district court seemed to be a little pestoed off at you, I guess. Well, there was a motion filed, and the district court clearly was, by the sanction that it imposed, I think not pleased, clearly, to say the least. But you're right. The court said, I think in its opinion, that there was two months of water that had gone on the bridge, and we briefed it below and said we're talking settlement. The plaintiffs, or rather the defendants, know that we chose to stand on our complaint. So I think the first question that the court ---- Does one day matter because you waited past the 30 days to start your settlement? Or ---- Well, the settlement talks were one day after 30 days, right? I don't recall, but I'll take that representation. I don't think it does. But I think the operative legal issue here is the language of the court's order, is the threshold issue. One is if you wish, you can do it. And I think if you look at the U.R.S.H. case, especially Footnote 4 of the U.R.S.H. case, it talks generally about 41B dismissals in the context of filing amended complaints. And the court, the Ninth Circuit said in Footnote 4, a plaintiff has a right to simply allow the complaint to be dismissed. That's not a case of extreme ---- Then we had the Edwards v. Marrin Park case, which suggests that, oh, yeah, you can do that, but call the court up and tell them. That's right. Edwards does. And because you didn't call the court up and tell them, then you can dismiss with prejudice. Edwards, I think, at the very end does suggest that. So I think, if anything, the case law, certainly U.R.S.H. is still good law. Edwards, I would argue, really is focusing on the propriety of the four verdict factors, which I'll get to in a second. So if you go through the verdict factors, which I expect you're going to get to, and you don't give notice and the court is now weighing the appropriate factors and does, then what is my standard of review? I have a feeling you might ask that question from sitting in the courtroom. There are two standards of review. One is sort of it's an error of law whether 41B was even applied in the first place, but it's an abuse of discretion standard. I think we say that in our briefs. Well, I think you do too. So it seems to me you did not call the court. They went through, the court went through the verdict factors pretty carefully, even citing verdict, weighing each factor, and said at the end, three out of five weigh heavily in favor of dismissal. Bye-bye. I think there are three tiers to this analysis. One is whether the 41B should even apply in the first place, particularly given the permissive language of the court's order. The second one is what you were talking about. Well, I don't know why you can say that when Marin says that's exactly the case. Well, yours says somewhat differently, and especially if you look at footnote four. I don't think footnote four takes away from Marin Park at all. I don't know why it does. It just says you can do what you want to do. I think Marin agrees you can do what you want to do. It just says if you don't want to do anything, call up the good court and tell them I don't want to do anything. But this particular order said if you wish, go ahead and file, or you might get to. What is the order in Marin that is so different? I think the Marin order says. Granted, leave to amend, but failure to file the amended pleading by the deadline will result in dismissal of the complaint with prejudice. Right. This one says if you wish to file your complaint. I mean, there's clearly ours has optional language, not the mandatory language. Well, the plaintiff there filed an election to stand. Right. We did not. The second tier is the weighing of the verdict factors, and then the third tier is whether or not the court can get to the merits arguments nonetheless, even if it finds the 41B dismissal is appropriate. And yours holds, and clearly the case in yours, the court did get to the underlying dismissal, the 12B dismissal factors, even though it found the 41B. So I call that double-barreling in terms of. But, you know, one of the times we don't like to. If, say, if it's a jurisdictional question, it's like, well, we're saying we have no jurisdiction and we should dismiss. But even if we do, then we're going to peek under the covers and we're going to say you lose anyway. Right. So but you're saying 40, that here that's different. Yes. That we can say we could say you lose on the 41B, but then still get to the 12B6. Yours holds that. And I think Judge Curiel below in footnote 2 of his order actually recognized that yours holds that you can still get to the merits of the underlying rule 12 dismissal. Okay. So why don't we talk about that then? Okay. Unless either of my colleagues want you to linger on 41B. Well, my worry is that you've got yours that you're citing to me, 1999 case, and you've got Eldridge v. Block, which I looked at, which says you haven't got to go through the merits. You can just do it. If you're going to do it on an abuse of discretion standard and you're dismissing, you don't have to go through the merits. And then I've got two unpublished decisions which follow Eldridge. So if you're going to say I've got to go through the merits, have I got to send this on bonk? Because I've got two cases. I can try to distinguish your-ish, which is what Eldridge did, or I can say, boy, you all have tried awful hard, but I don't know how to think about this, so tell me in a non-bonk court what I ought to do. Well, I think there's authority here for you to look at the merits under your-ish. Well, what you got? What are you going to do with Eldridge? May have to. I mean, sitting here, I'm hesitant to tell Your Honor what to do, but I think your-ish clearly states that you can look at the merits of it. But you're saying Eldridge counsels to the contrary. Well, and I'm kind of like my colleague here. So we're going to go with 41B and we're going to say we really shouldn't have this case because it's not been prosecuted, but guess what? Now go look under the covers and see what this is about. Well, you say it's not been prosecuted. Remember, 41B applies to two circumstances, failure to comply with a court order or failure to prosecute. And local rule 41.1 is the failure to prosecute standard, and that's six months. So another argument, there wasn't a six-month trigger here before the case was ultimately dismissed, so I don't think it can be a failure to prosecute case or rationale as well. Okay. I understand your argument. So moving into the 12, the Rule 12 areas of dismissal, the first issue that the court dismissed on is saying that there was not an adequate Section 1 conspiracy pled. We allege that the court applied the wrong standard. Taking Twombly, just from Twombly's holding, and it's plain words, a plaintiff has to plead enough factual matter taken as true to suggest that an agreement was made. It's not a probability requirement. The judge sitting and ruling over the 12B6 motion may not think the proof is probable, and he may think that recovery is remote and unlikely, but you just have to plead factual facts that suggest a conspiracy is plausible. What the court did here is it said, no, the standard is you must plead facts which exclude the possibility of independent action. That's the old Matsushita summary judgment standard, and this is not a conscious parallelism case. That's absolutely the wrong standard here. We allege agreements, and the court did a couple things wrong. The court then went and did exactly what the Supreme Court counsels that trial courts shouldn't do, which was look at the conspiracy that was pled, not holistically, but in particular segmented isolated acts, wipe the slate clean, and then went on as sort of the fact finder, finding their own interpretation of what these isolated facts were. Well, what the court said was, as I understand it, and I guess I want to see if you disagree, it seems to me the court was saying there are not enough alleged here to get there. If I look at Kendall, I don't know whether there was enough alleged here, but after you get through all of that, then it went through what facts were suggested and said they're either statutorily protected by the activities of the union, their activities protected by judicially created exemptions designed to foster the good relationships, or their activities undertaken by the defendants in pursuit of their respective interests. Isn't that what the court said in three different ways? Here's what the court did. If you took the facts and put them in a universe here, it looked at these facts over here that was a subset and then went and proceeded to act as a fact finder. I think when you look at the myriad of cases, Starvey-Baca, whether it's the Watson carpet out of the Sixth Circuit, which said that there are often several plausible explanations, the court's job at the Rule 12 stage isn't to ferret out which of the ones is most plausible. The Anderson News case from the Second Circuit, Evergreen from the First Circuit, the Erie County case, and there's actually another case that was issued after briefing here that wasn't cited in the supplemental letters, and that's out of the Fourth Circuit. It's the SD3 LLC Black and Decker case where the court talks pretty much exactly about what happened here. But what the court should have done is actually looked holistically, and if I could spend two minutes on the facts of the underlying dispute, what the court should have done is not segmented and picked out a couple in isolation and put its own explanation for them. It should have looked at it holistically. Sotomayor. But I guess you list all these, this slew of meetings that this plan, when it was hatched in these meetings, and you also emphasize this is 12B6, just give us some time to get some discovery, and then we'll be able to. But because of the pleading standard here, don't, you know, what do you have more than the meetings actually happening? You don't have any, you know, if you had some people there that were saying some things that would be more conspiratorial. Perfect. That would be helpful. Head on. Well, that's always good. And here's the arc of the conspiracy. The seed of the conspiracy was planted in the 1980s when Congress changed the Medicare and Medicaid reimbursement scheme from a cost plus to a flat rate. We know what happened in the 80s where you had the rise of HMOs. It was a turbulent time in health care industry. Hospitals were going under, and Kaiser was experiencing a lot of financial pressure. In 87, and Kaiser historically had a really head-on-to-head relationship with the unions. In 1987, there was a strike that caused the unions to submit the complaint. Of course, all of it's in the complaint. Adopt a two-tier wage system. They're still undertaking an adversarial relationship with each other. What happened in 1992 was they tried to. But just establishing that Kaiser is trying to survive, that doesn't equate to a Sherman Act violation. I'll get right there. Okay. So I'm just giving you the seeds here. Go to it. Going right to it. So what happened? I don't want you to get too far in the seeds. It seems like Congress is a part of the conspiracy. Congress is not part of the conspiracy. So what happened? In 1995, after more strikes, they had a meeting at Dallas-Fort Worth Airport. We allege the who, what, when, where of that. That's in 89 to 90 of our complaint. They decided that they needed to work together. Okay, may seem innocuous enough right here. What happened in 1995, which was a complete 180-degree reversal, all of a sudden the union started targeting another individual. They targeted Columbia HCA with a corporate campaign in 1995. Same stuff we saw back in the beginning in 2009, 2010 with Prime. They called it their Code Columbia campaign, and it was a corporate campaign where they attacked, and they tried to get them to adopt a higher cost union model labor standard here. Okay, not sitting in isolation. What then happened? There was a 1997 written agreement that was inked between Kaiser and the unions. It said, fairly innocuously, one could read in isolation, this is to expand Kaiser Permanente's members in current and new markets. Another agreement in 2000 with a reaffirmation in 2002. What happened in that period? You start seeing acts where the union and Kaiser are acting against their own interest. For example, Kaiser Permanente supported legislation that would increase nurse staffing ratios. What does that mean? It means it's going to increase their cost. It doesn't make sense. Okay, you can look at it in isolation, which is what Judge Curiel did below, and said, well, this is part of the give and take of the labor process. It's not his job to do that and make that call. 2005. 2005, there's a meeting. They announce and they say, and it's in our complaint, paragraph 128, the purpose here is to transition from a labor management partnership, okay, labor management partnership where you get the statutory exemptions and certain activity is protected, their own words, transition from a labor management partnership to a health care partnership. What also is happening at this time? You had Columbia, HCA in 95. In 2000, when they met and had another agreement, part of the agreement was to assess the critical threats facing Kaiser. They did the same thing to Tenet in the early 2000s. In 2000, they capitulated by 2003. They did the same thing at the same time to CHW in the early 2000s. CHW decided to play ball with them. Then you have the meeting where they say we're moving into a health care partnership, and then they have meetings and more agreements and another agreement in 2005, and then they have another agreement in 2010. 2010 is where publicly, and we put this in the complaint, they say now we're going to target Prime Health Care. We're going to target Prime Health Care at this part, like we did with Columbia, Tenet, CHW, and we're going to go after them to protect Kaiser's space in the relevant market. And so they went on their corporate campaign against Prime, and we list in detail the business attacks that were undertaken by the union and why this is all outside the exemptions afforded, the antitrust exemptions afforded to labor unions under traditional antitrust law. I mean, this is Connell Construction, Hutchison, United Wine Workers v. Pennington, and the Ninth Circuit case of the U.S. POSCO case at 31 F3rd 800. Let me see. Do you want to reserve any time for a rebuttal? I do. Did you want to ask any questions? No, I have nothing. I was listening. So why don't you save the balance of your time for a rebuttal? Thank you. Okay, so before we start the clock, let me find out how you want to divide your time. I'm David Frederick for the Kaiser defendants, and I'll present for 12 minutes and the Mr. Small for the union defendants for 8 minutes. Okay, and that's 20 minutes, so you can tell time. Thank you. Okay. I'd like to make two quick points on the merits that should easily dispose of this case and lead to affirmance before addressing the Rule 41 issue. There are two fatal flaws that affect all four antitrust complaints. The first is that there is no plausible allegation of injury to competition as opposed to crime as a competitor. And the second, there is no plausible allegation that Kaiser, with only 15 hospitals and a market of 125, has market power. Both of those elements have to be plausibly alleged for prime to be able to sustain legally its antitrust claims, all four of them. So you can affirm on the ground that the district court properly ruled that as to those two elements, there were insufficiently plausible allegations. I'd be happy to go into them through the merits. They weren't addressed today, but they are absolutely fatal to Prime's antitrust case, and you can affirm on those two grounds alone without addressing some of the more difficult agreement issues and Rule 41 issues. So I have the numbers right. Kaiser has, what, about 12 percent of the relevant hospital market in that area? That's correct. Okay, because there's, what, 125 hospitals and Kaiser owns 12 percent. Is that right? That's correct. And under any reported decision that we have found on antitrust dealing with either agreements to restrain trade or monopolization, 12 percent doesn't cut it. And when you look further at the allegations of Kaiser's ability to control output, affect prices, affect competition, there's nothing in this complaint that would suggest that a player like Kaiser has that ability to do those things in an anticompetitive way. It simply isn't alleged there. So you're saying if we agree with you on that, we don't actually have to reach the Rule 41 issue because we can say, assuming arguendo, that this should not have been a Rule 41 dismissal but just a 12B6 dismissal, they still lose. That's correct. Now, if there are any other questions about those two elements, I'm happy to talk about the agreement issue or to go into the Rule 41 issue. This is an abusive discretion standard. And I think that after the district court, two different judges had looked at this complaint, the original complaint and the First Amendment complaint, and had explained in very good detail the failure to plead all of the requisite elements of the antitrust claim,  the complaint was going to be dismissed with prejudice. Prime did nothing, and it did not notify the district court of what its intentions were until after some period of weeks and several months. And then after the unions had filed for a dismissal under Rule 41, it was only at that point that Prime came forward and said, hey, we're going to take our appeal to the Ninth Circuit. I think the district court was well within its discretion in applying the verdict factors and deciding. So you were the trigger. The district court wasn't doing anything until it was doing other cases and not really paying attention to the deadlines, and you were the trigger by filing your motion on the 41B. That's right. That's right. Otherwise, the case would have sat there and all of it. It wasn't just – it was sitting there in terms of the district court, and that's relevant. But as I understand it, you were talking settlement, yes? I think that it is fair, Judge Rakoff, within the confines of what I can talk about settlement in an open court, that parties talk to each other all the time. There is an email exchange suggesting that there would be some discussions. But I think the important point is that from the district court's perspective, in the management of its docket, in prosecuting cases to have them resolved, the question before you is, was the district court acting outside its discretion in deciding enough is enough? Well, I can't see too much prejudice to you for the time period. I mean, it's not like this thing has become, you know, RIP and that the witnesses have died and, you know, anything. It's not very long. That is certainly true, but this court's cases have said that when there is no explanation ever given for the delay, the prejudice to the defense is going to be presumed. Yeah, but just looking at the five factors, so the courts need to manage its docket. I don't see how this affected its docket one way or the other. It's either going to be a dismissal under 41 or a dismissal under 12b-6. But either way, it was off the court's docket. Well, it's not off the court's docket until somebody precipitates. Well, of course, but nothing is happening. Right. It's not as if the court is being act as interfering with the court's handling of other matters. That is certainly true, but at least as a statistical matter, as this Court is aware, these things matter to the administrative office. And district courts, I think, properly have the discretion to manage their dockets in the way that they deem appropriate, consistent with the rules. Well, if it was of concern to the court on a statistical matter, then the court could have called up as opposed to waiting for the other side to call up and say, what are you going to do? And it's really hard for me to see how there was any prejudice to the defendants in any real sense. I hear what you say about presumption. And, of course, it wasn't a disposition on the merits, so far as the fourth factor is concerned. And in terms of the availability of less drastic alternatives, the obvious one is to issue the dismissal on 12B6 grounds and then the appeal clock starts to run. Well, Judge Rakoff, you know, sitting here as a very experienced district judge, how you would have weighed the Rule 41 factors in light of the circumstance before you is relevant, certainly. Whether you're viewing what the district court's explained rationale in its opinion as an abuse of discretion, I think, is a different question. But I think you're right. No, no, I understand. Believe me, I believe that abuse of discretion standard is right up there with the First Amendment and, you know, but there still are some limits. I understand. And I'm not here. The reason I started my argument with the two merits points that I think are absolutely fatal is that the court can readily go past the Rule 41 question without having to get too enmeshed in what I think in Yorish, to be fair, was a very unusual situation because in Yorish, the district court had not explained anywhere why it had dismissed the complaint. And so when this court had the Rule 41 issue on appeal, it first went through all the verdict factors and it concluded that the Rule 41 dismissal was appropriate. But I think conscientiously the judges that were on that panel thought it was appropriate to explain to the public why this complaint was fatally flawed and was dismissible. And so it therefore then went into a discussion of the factors as to why the That appears to be the only case from this court that we have found under Rule 41 that actually goes into the merits after the Rule 41 dismissal factors have been analyzed. And I think because of that anomalous situation, it is one that can be readily explained not as a mandate for the court to look into the merits, but simply as an explanation given the unusual facts and circumstances of that particular case. Now, if I could turn back to the merits for a second. One of the things that I think is striking about the argument about this agreement, it is quite fantastical to suppose that an antitrust conspiracy against Prime and Prime's competitors started 16 years before Prime even entered this market. But that's what the allegation was as represented by counsel today. So is this vertical rule of reason? It is vertical rule of reason because under Ligon, we're talking about the channel that is going up and down here. Their assertion is that the conspiracy is between the unions, the labor force. They're claiming horizontal. They're not limiting it to vertical, are they? Well, I don't think they have a plausible allegation that it could be horizontal in light of the fact that we're talking about Kaiser's workforce. But in any event, we're talking about rule of reason classic under the Ligon Supreme Court decision because their essential allegation, as I understand it, and it is quite incoherent if you think about it from an antitrust perspective, is that by conspiring with its labor force, Kaiser was intending to harm every conceivable competitor in the market and thereby claim a position of monopolization from what has been acknowledged is a rather modest market share. That's just a fantastical and completely implausible assertion. And what this bleeds into the Twombly point is that what Prime is seeking to do is to take essentially its unhappiness at some contractual disagreements between Kaiser and Prime for repaying when some of the Kaiser patients got health care services at Prime Hospitals and transform that into an antitrust case, which the Supreme Court in Twombly said, we're going to look really hard at claims of antitrust, particularly in these circumstances where there are very plausible explanations for why business entities have done what they have done. Kaiser has made determinations to work collaboratively to the extent that it can with its labor workforce. Can you respond to the septicemia attack on them? Well, that is, I think, maybe a question better addressed for the unions, which I would defer to Mr. Small. Kaiser was not a party to that particular. I would just say generally that when we're talking about health care services, it is certainly right and appropriate for entities in the market to be making comments about what they deem to be quality care. I think they said something that Kaiser told them to call a nurse before they go to a doctor. And that is a situation where in a managed care scenario, Kaiser, I think, is well within its business judgment to ask its patients to say, hey, can we double check that you actually need to go to the emergency room? They happen to be, you know, expensive, they're busy, they're flooded. Call a nurse practitioner, have the nurse talk to you about your condition and determine do you need to go to the hospital five minutes from your house or maybe you could take a little bit more time, make an appointment, go to Kaiser and have it done in an economical way. That is a completely legitimate business decision and it's probably one that would lead to sound health care that I think we could all agree is a plausible explanation for why Kaiser would be asking for that kind of situation. Judge, if I determine that I must reach the merits, why should I do it? Why not return it to the district court who did its best it could with the Rule 41 analysis and let it decide the case? Because it has. It's decided the merits. But it did not decide the merits of this particular matter, do you believe? I do believe they have, Judge Smith, and here's why. Prime made the decision after the second dismissal of its complaint that it really was going to rest on that complaint. It had no further allegations. So the Rule 41... So your analysis is it made the merits because it made a decision on a B6 decision? That's correct. It was dismissed the second... I wanted to make sure that was your... Yes. They amended their complaint after it had been dismissed the first time. I understand. They dismissed this complaint the second time with a very long decision going through all the elements. This is now two district judges who have looked at these basic allegations. And it was only when Prime never came forward and said, hey, we are intending to rest on this and take an appeal and test these allegations in the Ninth Circuit that the whole Rule 41 issue came up. So I think, Judge Smith, you do not need to send this back and you should not send this back because Prime, by its conduct and its litigation behavior, has concluded this is the best they have. So there would be no good purpose served by sending this back to the district court for one more take on what are a lot of sprawling allegations that ultimately can't make up what are crucial elements of an antitrust claim on all four of their counts. Okay. Do either of you have any additional questions? No. All right. So I'll give you your eight minutes. Thank you, Your Honor. Thank you for answering our questions. Good morning. I think still. Yes, it's still good morning. Still good morning, Your Honor. Dan Small for the Union Dependents. In addition to Prime failing to plead facts that show a plausible conspiracy or facts that show injury to competition or that Kaiser has market power here, Prime alleges injury from alleged conspiratorial conduct by the unions that consists entirely of lobbying and litigation, all of which is protected by the Nora Pennington Doctrine. Direct lobbying, Your Honors, of the government is absolutely immune. There is no sham exception for direct lobbying of the government. That's this court's decision in franchise realty. Now, Your Honor mentioned the septicemia studies that were done. Those were prepared by UHW, and the first thing that was done with them, Your Honor, was to give them to the government, to members of the House of Representatives, the U.S. House of Representatives, members of the California- But they did. So they did an investigation, and then they found it wasn't warranted, or what? What happened? So there were three investigations that ensued after the SEIU gave these reports to government entities, one by Health and Human Services, one by the California Attorney General, and one by the California Department of Public Health. The only allegation in the complaint is that one of the investigations by the California Department of Public Health had terminated. The other two, as far as we know, have continued. As to the one that was terminated by the California Department of Public Health, what we know from the record, contrary specifically to the allegations that Prime made in this case, is that the hearing officer on review of the record determined that, in fact, upcoding was a concern and referred that concern to another agency for investigation. The only part of the charge that was dropped was a very specific and limited charge against Prime with respect to its medical recordkeeping, nothing to do with the upcoding charge or the possibility that there was a health care problem at Prime Hospitals. And so we have no exoneration here through any government investigation. So that's the situation. And, in fact, Prime does attempt to show the falsity of what's in those reports, but they don't even begin to show that, Your Honor, under any standard, whether the court were to apply Rule 8 or Rule 9b or, as we believe, the actual malice standard because of the fact that Prime is seeking damages to its reputation. So the first thing that Prime tries to do is point to a Center for Disease Control recommendation, which, by the way, came out much after the conduct in question. And to say that the CDC recommended that the right way to deal with septicemia is to aggressively treat it even before the diagnosis is made. But here, the study that the SEIU and UHW did was of septicemia diagnoses, nothing to do with whether there was aggressive treatment earlier. It's how often this blood infection was being diagnosed by Prime. And they had very, very high rates of infection, which led the SEIU to raise the question, just to raise the question. Well, now, let me ask about the 41b motion, since I don't have a lot of time with you. Did you file it, and did Kaiser join you, or did you just file it? We filed it, and I believe Kaiser joined in it. So the unions filed the motion. That part I'm certain of. I believe that Kaiser joined it. Why don't I look at that from the standpoint that you filed 41b sanctions in the middle of settlement negotiations? Had negotiations gone south at that time? Your Honor, I personally was not involved or even aware of them. My understanding is that there were – Well, I guess why didn't you just simply seek a 12b dismissal with prejudice rather than 41b? Well, Your Honor, we believe because of the delay and the failure to comply after two months with a court order directing them either to file an amended complaint or under the case law give notice of the fact that they were not going to do that, that they had an obligation to proceed one way or another. Well, I sort of see it as – I don't really – I don't see how you could have possibly been that prejudiced. But that being said – Well, you agree with Kaiser, do you not, that even if we find that the 41b was inappropriate or an abuse of discretion, we should still reach the merits here. We should not send it back for an evaluation of merits. Yes, I – Because one thing is for sure, which is that the plaintiff had 30 days and only 30 days to amend. They chose not to amend. Therefore, they were signaling unequivocally that they were sticking by the complaint that had now been dismissed in the 12b-6 motion. Yes, Your Honor. And in addition, in the hearing before the district court on the second motion to dismiss, counsel for Prime was very clear with the court that they – that Prime believed there was nothing else it could elect beyond which it had in its second effort to state a claim or second amended complaint. So we believe there have been now two decisions by two different district judges reaching the same conclusion in proper opinions analyzing the issues. And now it's before this court. I think Prime has had plenty of process. I do want to mention two other quick things, one to dovetail with what Mr. Frederick just argued, which is the lack of any allegation here, Your Honors, that there's been harm to competition as opposed to harm to Prime. In fact, even the harm to Prime is very vaguely and weakly pled here and believe that's not even sufficient. But it's not enough just for Prime to allege that it was harmed by any of the conduct, which is protected here, by the way, too, by Norr Pennington and the non-statutory labor exemption and by the pleading standards. But even if Prime were injured, there's no harm to competition here alleged. And that goes to two things. That's whether there's an antitrust claim that's been pled here at all, number one. And number two, to take this case outside the non-statutory labor exemption, Prime would have to show that the conspiracy caused a direct and substantial restraint in a business market. And that, too, is a failure here. They have not alleged the facts that would take this out of the non-statutory labor exemption. The best that Prime has come up with on that is a very general allegation that there was a conspiracy to eliminate competitors in the market. But I would say, number one, that that's incredibly vague. And number two, that they allege that conspiracy began in 1997. We're talking now almost 18 years ago, although at the time they filed the complaint it was 15 years ago. And at some point, Your Honors, the failure of there to be any exit from this market, and, in fact, you have allegations to the contrary by Prime itself, that it's a thriving competitor, that it's growing, that it has success in the market, that it has a superior business model, that all of those factors also undermine any credibility that there is this conspiracy to eliminate competitors when that hasn't happened in 15 years. All right, you're on overtime at this point. So unless my colleagues have any questions, you're done. Thank you, Your Honors. All right. I'll give you three minutes for rebuttal because we took a little extra time with the other side. I'll just note the outside. We spent a lot of time here arguing about facts and what they really mean and explaining the allegations and the lights most favorable to them and having them do what they did below. It's not the job at the Rule 12 stage. About the long nature of the conspiracy, we took action when the guns of the conspiracy turned against us. The fact that they had done it in the early 2000s with Tenet, Columbia, CHW, so on and so forth, to now say, well, it's been going on for a long time, I can't believe they're going to try to hold us to this conspiracy that's going on for 15 years. No. When the conspiracy started acting against us, we took action. Antitrust injury, we talked about the antitrust injury. What is it? Raising a rival's cost is injury to competition. That's the premier specialty construction case. Why don't you talk about the two things that Mr. Frederick said are fatal to your case? Market power and injury. Yes. So what is antitrust injury? Raising a rival's cost, premier specialty construction. Conduct causing increased prices, reduced output, reduced quality, reduced choice. That's antitrust injury. That's the West Penn Allegheny case. That's the Third Circuit. This circuit, rebel loyal. Conduct is anti-competitor under the Sherman Act when it harms allocative efficiency or raises price of goods above competitive levels or diminishes their quality. Our complaint is replete with facts that tell exactly how this conspiracy does it. Raising a competitor's price is the whole object of the conspiracy. Impose the union labor model on non-union shops so they can keep the conspiracy going. We talk about the Garden Grove example in paragraph 56 of the complaint where the average labor cost for non-union, 30%. For union, their Garden Grove, 60%, double. Of course it raises costs. The other conduct of the conspiracy, all designed to raise our costs. Refusing to pay prime for prime work and physician work that's done for Kaiser patients raises our costs. Increased prices, that gets passed down to the consumer. That's antitrust injury. You've got 57 seconds. Move to market power. Market power. Market share is not the only evidence, Your Honor. Barr versus Abbott Labs, you can prove market power by strength of competition, barriers to entry, nature of the anti-competitive conduct, the elasticity. Where are the allegations concerning significant barriers to entering the market? The allegations, well, the allegations are. First of all, I look very toughly at both of the questions the counsel suggested affecting competition. I'll go read again what you said about affecting competition. Frankly, I didn't find very many facts. I found a lot of allegations generally, but I didn't find facts. But I'll look at them again. When I looked at the Sherman Act Section 2, I said there's nothing in here about there being any market power, monopoly power in this relevant market. And furthermore, I don't find anything in here about allegations concerning the significant barriers to entering the market. Building a hospital with a regulatory and significant capital cost. Where does it say it in your complaint? I didn't find it. Or what are the facts that are alleged that the existing competitors lack the capacity to increase their output? I looked for both. I couldn't find them. What was your second question, Your Honor? What are the allegations concerning the significant barriers to entering the market? I mean, the reason I say this is because I kind of teach this at ISU. You wouldn't think a little Pocatello podunk would ever think about this kind of stuff, but we do. And so I look at Section 2, and I look at market power, and I look at what you have to allege, and I frankly couldn't find it. I looked at what you do in Section 1 because I have to teach about it. And frankly, I saw a lot of general allegations, which to me are puffery. I don't believe we really get to the Twombly stuff, and so I'm going to reread your stuff. But let's concentrate on Section 2. Okay. Barriers to entry. We say that others lack the ability to increase output because you have a hospital, and it's difficult to do that when you have a static institution, a static bed with a certain number of beds and rooms in a hospital, and the regulatory burdens that you have to overcome. That's at paragraph 34 of the complaint. High cost and regulatory requirements for both establishing and running a hospital, 41, 353. Well, frankly, I'll have to look at them because I don't think that has anything to do with what we're talking about under Section 2. And also, how about the inelasticity of demand? You know, you don't go. You go to the emergency room that's nearest to you. You know, demand is very inelastic. I mean, that's what we allege, and it's common sense. Iqbal, you don't check your common sense right at the door. All right. Thank you for answering my question. I just want to be sure I understand your position. Do you agree that if we were to find that the Rule 41 dismissal had been improvidently granted and it was an abuse of discretion, that we still don't send it back, we now reach the merits? That's right. You go straight to the Rule 12 decision. All right. Thank you both for your helpful argument in this matter, and it will stand submitted in the courts in recess until tomorrow at 9 a.m.
judges: Callahan, N.R. Smith, Rakoff